v. Trump, that is 23-793. Mr. Sauer, is that correct? Yes, Your Honor. And am I correct that you have reserved two minutes for rebuttal? Correct, Your Honor. Okay, when you are ready, you may proceed. Thank you, Your Honor, and may it please the Court. John Sauer, appearing on behalf of the appellant, President Donald Trump. This case is a textbook example of implausible allegations being propped up by highly inflammatory, inadmissible propensity evidence. As President Trump testified, he never even met Ms. Carroll and didn't know who she was until the allegations were made. There is no physical evidence, no eyewitnesses, no DNA, no video, no complaint, no police report, no investigation. A quintessential he-said, she-said case that involves a plaintiff with a political motive to bring a story, who's funded and encouraged by President Trump's political enemies, raising decades-old, 40-year-old allegations, decades-old allegations. Your arguments are evidentiary issues. And as you know, we give great deference to the district courts on these matters. It's very hard to overturn a jury verdict based on evidentiary rulings. We use phrases like manifestly erroneous. So why should we order a new trial here? Your Honor, I think for two reasons. It's very clear that there was error in the admission of the propensity evidence. So the Leeds testimony, the Stoynoff testimony, the Access Hollywood tape, as we pointed out in brief, none of those are even remotely admissible under Rule 413 and Rule 415, which is the principal reason. And then as to the 404B argument they've kind of pivoted to after the trial, they argue that it was evidence of modus operandi. And of course, modus operandi evidence has to be used to show a proper non-propensity purpose, which they've never identified. So identity is not at issue here. Absence of mistake or accident, not at issue here. You have a situation. Sorry, Your Honor. Go ahead. You do agree, though, that Congress has passed Rule 413, 414, 415 to allow propensity evidence that would be excluded in other kinds of cases, but to permit its consideration by a jury in certain cases here. Only if it meets the criteria set forth in this case, 413D1 through 5. So take, for example, the Leeds testimony. That's the sort of 1979 story about the airplane. Again, it never happened, but assume that the jury were to accept the argument. It has to meet those criteria. 413, for example, it has to be a crime under state or federal law. They never even identified any statute that this conduct alleged supposedly violated except for 49 U.S.C. 46506, a statute that was enacted 15 years after the allegation in place. What about federal rule of evidence D5 and 2, 5 being an attempt, 2 being contact without consent between any part of the defendant's body and another person's genitals? If the defendant, assuming it's true, put his hands up her skirt, why doesn't that qualify? I think the case law here- Why would that be an attempt to engage in that conduct? The case law, I think, on attempt is very strong for us. I think decisively rejects that. I point to the Hayward case from this court, the Rogers against State case from the Florida Supreme Court, and other cases. For example, if you look at the facts of the Hayward case, there are facts that are just egregiously beyond- But if you look at this case, is it manifestly erroneous for Judge Kaplan to say, yeah, this is at a minimum arguable and we'll let the jury decide? As we argue in our brief, the proper standard of review when it comes to a legal error on the interpretation of Rule 413 is de novo. But it's erroneous under any standard of review. Because if you compare it, for example, to the egregious facts of the Hayward case and the Rogers case, even what was alleged, which I emphasize never happened, even if it was alleged, it would be anywhere close to fact patterns that this court has rejected as attempts and also the Florida court as well. I just want to take a step back. My understanding from both of the papers is that our court has not yet ruled on what is a standard of admissibility for under Rule 415. Both of you cite to Third Circuit law. Is that correct? That's my recollection of their briefings. So in your view, that this is a question of first impression for us? On the standard of admissibility for Rule 413, it depends on which of the issues we've raised. Some of them are addressed in other circuits and some are not. By and large, the arguments I've been addressing now are questions of first impression for the Second Circuit. However, we point to case law from other circuits that's very— So is there anything about the Third Circuit's understanding of what this admission standard is that you would have us depart from? Not that I can think of, but there are multiple Third Circuit cases. I want to be careful how I answer that because there are multiple Third Circuit cases cited in the briefing. There may be things in some of them that we disagree with. Overall, the standard of admissibility is what's set forth in the plain text of 413. I want to make sure the standard that you believe that we should be dealing with is a reasonable jury confined by a preponderance of the evidence. Is that correct? Yes, we have not disputed that in our brief. That's correct. And that is the one that you believe that we need to adopt in order to move forward? I would say we have not disputed that in this case, is the way I'd frame it. And again, that standard, however, in this situation, we're dealing with interpretive questions. As the meaning of phrases in 413, D1 and D5 and D2, those, for example, are pure questions of law that are subject to de novo review. That's not a situation where a reasonable jury can determine whether or not something legally constitutes an attempt, for example. As one example. Take another example. If you look at the Stoynoff, or sorry, if you look at the Leeds testimony. I'm sorry, you're speaking so fast. I apologize. Slow down a touch. It's an important case, and I'm passionate about it. The Leeds testimony, for example. We've argued that the Leeds testimony was inadmissible under, for example, D1. D1 says conduct prohibited by Chapter 109A. Every federal statute in Chapter 109A has a federal jurisdiction requirement that's an element of the offense that says within the territorial and maritime jurisdiction of the United States or similar language. What do you make of other statutes where the phrase conduct prohibited by is used as distinct from jurisdictional requirements? For example, 18 U.S.C. 2332 G.B. also has the conduct prohibited, but they also have a jurisdictional statement. How are we supposed to take your argument in this matter? Isn't this also an area of first impression for us that we have to decide whether or not the jurisdictional elements are incorporated? And it is one where there's clear guidance from the U.S. Supreme Court, for example, in the Omni-Capital decision that we cited as well as the Hart v. Reliance Insurance cases, where the Supreme Court says, look, when Congress knows how to specify something, then the fact that it didn't do so raises the inference that that's not what they intended. And we cited, at least as your Honor points out, six federal statutes. But doesn't that presume the acceptance that conduct also incorporates a jurisdictional requirement? They use the words prohibited conduct as opposed to an offense or some other interpretation. So if you could just hone in on that particular component of it. Yeah, and we point out the plain meaning of prohibited is to forbid by authority or command. In Chapter 109A, Congress has not prohibited conduct that doesn't occur in certain federal enclaves, essentially. These statutes were intended to allow, contrary to common law, evidence regarding conduct that was serious, of a serious nature. And I'm not sure how the jurisdictional element, the precise jurisdictional element, whether in an airplane in the specific maritime jurisdiction or what have you, impacts the conduct that Congress was willing to let juries consider in adjudicating these kinds of cases. Could you address that concern? Sure. I'd say two things in response to that. First of all, Congress' intent is best reflected in the plain language of the rule that it enacted. That rule says it has to be conduct prohibited by 109A. And there really isn't a good argument that that means conduct that, if it had been performed in special maritime and territorial jurisdiction, would be prohibited, which is what they argued it means. And one powerful evidence of that is there are six federal statutes where Congress said exactly that. They said conduct that, Your Honor, I see my time has expired. May I finish answering the question? You may finish, but then move on. Okay. And so there are six federal statutes where they said exactly that, conduct that, if it had happened in these federal enclaves, would be prohibited. Here they did not say that in the compelling inferences. It's not what they intended. Okay. Thank you so much. We'll hear from you on rebuttal. We appreciate it. If you don't mind, Ms. Kaplan, starting from the jurisdictional issue. Yes. I'm going to move this down. I'm sorry. You should. We wouldn't be able to hear you otherwise. Thank you. Yes. Roberta Kaplan, plaintiff, E. Jean Carroll, appellee. May it please the Court. I don't believe, Your Honor, does have to decide the jurisdictional issue. You could decide it here, Judge Perez, but you don't need to. And the reason is, is because there was, there's a federal crime now, independently of what Mr. Sauer talked about, that prohibits sexual contact in the special aircraft jurisdiction of the United States. I'm sorry, Your Honor, I've become an expert on aircraft jurisdiction now. And even with respect to Mr. Sauer's argument, which he raised for the first time on reply, that there wasn't a statute in 1979, there was a statute in 1979. It prohibited assault on a plane. And what Ms. Leeds testified that Mr. Trump did on that plane was clearly an assault. So you can decide the jurisdictional point, but I don't think you need to for those reasons. Your Honors, taking it back a little bit. Despite the prominence of this case and the parties involved, it really just involves the routine application of the federal rules of evidence. That application was performed by Judge Kaplan, who has many years of experience trying cases, and just so the record is clear, who is neither related to me nor is my mentor. E.J. and Carol brought this case because Donald Trump sexually assaulted her in 1996 in a dressing room at Burgdorf Goodman, and then defamed her in 2022 by claiming that she was crazy and made the whole thing up. After a nearly two-week trial, the jury found in Ms. Carol's favor. At trial, we called 11 witnesses. They included Ms. Carol, who testified for nearly three days straight, most of which was cross-examination. And here's what she said. Question. When you're fighting and being sexually assaulted and raped, because you are not a screamer as you describe it, you wouldn't scream. I just want to make sure that we're going back to the evidentiary issue. So I count that we have been asked to consider three questions of first impression. One of them was one thing that you mentioned a moment ago about whether or not 415D must have been a crime at the time that the crime was committed. Is that correct? And then the jurisdictional question about whether or not the requirements of 109A have been incorporated by D1. Your opposing counsel cites a judicial counsel recommendation, which Congress did not adopt, that would have added clarifying language to Chapter 109 who had made it crystal clear that the jurisdictional component was separate from the conduct component. What do you make of that? I'd make, Your Honors, as we always do with legislative histories, that Congress rejected that. And the Violence Against Women Act, which these evidentiary rules grew out of, were one of the few evidentiary rules that were actually passed by Congress. This didn't come from a rules committee. This came from Bob Dole and Susan Molinari of Staten Island, and it was part of the Violence Against Women Act. So to me that obviously only cuts our ways. And let me just be clear about what Judge Kaplan held here because I think its clarification would be helpful. As Judge Kaplan held, Trump's conduct is a federal crime because it violates 49 U.S.C. 46506. If you go to 460506, well, let me before I get there, under 43D2 it was an attempt, it was sexual contact and an attempt at sexual conduct. Section 46506 makes it a crime to do certain things on an aircraft, and here's my favorite phrase, in the special aircraft jurisdiction that if committed in the maritime and territorial jurisdiction of the United States would violate provisions of 18 U.S.C. In other words, section 46506 takes certain parts of the U.S. Code and says they're a crime on an airplane. As Judge Kaplan found, section 46506 cross-references 18 U.S.C. 2244A1, which covers knowingly using force to cause or attempt to cause another person to engage in sexual contact. Sexual contact is defined as touching directly or through closing the breast or inner thigh of any person or intent to do the same. What you hear from Mr. Sauer is that doesn't count, because in 1979 that wasn't a crime, and that's the argument they first raised on reply. But the answer to that is it was a crime in 1979, and this was a new statute put out in our brief because we didn't have a chance to respond to it. In 1979, the predecessor was 49 App. U.S.C. section 1472K, and under that section it was a crime to commit a simple assault on a plane. And there are multiple cases, including the Bays case. I thought your opponent said that the predecessor crime was actually rape. That's what he said. I believe that's incorrect. That's incorrect. The predecessor crime is a simple assault on a plane, and in the Bays case in 2000, the First Circuit held that that simple assault includes a guy who was on a plane and smacked the stewardess's tush as she was coming up the aisle. Assuming there is jurisdiction here, back to the facts of the Leeds case, why isn't it very different, substantially different? It occurred on an airplane, which makes it very different from the other incidents. Look, let me put it this way. The fact that this was on a plane, Judge Chen, has inserted all kinds of complexity in this case. It's actually not that complex. It was a crime then to grope someone on a plane. It is a crime today to grope someone on a plane. And as I said, I was thinking this morning, this may be a situation where you have too many lawyers trying to screw it up in a light bulb. You don't have to get to the head of it. It clearly was a crime. No, no, I'm assuming for these purposes it's a crime, but the fact, Karen, is different from the other incidents, which were in much more private places. And so does that make it too different to be relevant? I mean, the probative value becomes less. So I would concede that unlike Ms. Stoynoff, Mr. Trump did not lead Ms. Leeds into a private part of the plane. That's for sure true. But the rest of the pattern is exactly the same. He had a pattern of having kind of pleasant chatting with a woman, kind of, Eugene Carroll even testified that it was almost flirtation, was flirtation, very pleasant chatting, and then all of a sudden, out of nowhere, he would, for lack of a better term, Your Honors, pounce. And that's exactly what happened with Leeds on this plane. He didn't let her out of it. When she tried to squirm out, she ultimately succeeded. And then to finalize the pattern, once these three brave women came forward and said what had happened to them, he said the same thing about all three of them. So if we just say that you're wrong on this, that it's too remote, it's too unlike the circumstances that your client alleged, what assurance can we have that it didn't unduly affect the jury's verdict? So you're talking about Jessica Leeds? Yes. So you obviously report the remoteness in time.  You look at it, as I said before, in a manifest injustice standard. And I was going through the evidence at trial. It was incredibly powerful. Not only did you have Eugene Carroll, you had two outcry witnesses who she told immediately after the assault, who both testified, one of whom is in this courtroom today. You had two people who were former employees of Burdurff Goodman who did not know Eugene Carroll, but who corroborated fundamental facts about the operations and the layout of Burdurff Goodman back in 1996. You had a psychological expert who's an expert on trauma, Dr. Lebowitz, who, at Mr. Trump's counsel's question, was able to say that she believed Ms. Carroll and that Ms. Carroll wasn't malingering. I'm sorry, go ahead. The witness you're describing is someone who heard a report as opposed to was a witness of some kind. But please, go ahead, Judge. No, I was just going to ask, so is it your position, and it sounds like what I'm hearing you, is that you could lose all of the propensity evidence and you still think it would be harmless error? Like, are all of the questions that we're talking about harmless? I believe I could lose all of the propensity evidence and still be harmless error except that the Access Hollywood tape, as Judge Kaplan noted in his post-trial motions, is better admitted as a confession. Party statement. He said, this is what I do. I grab women by the pussy without their consent. It was after what he did to E.J. and Carroll, and we cite the case in our brief where a guy says, I'm a drug guy. Well, wait a minute. Isn't the harmless error standard harder for you because of the clear and convincing burden of proof on the defamation claim? No, because this is all about the assault, Your Honors. In order to prove defamation, we talk about, in rejecting the categorical approach under 415, as Judge Kaplan, as Judge Furman, and as every other circuit that decided it has said, there's an overlapping factual element, but it doesn't mean once the actual element is found, as it was found here on the battery claim, it doesn't mean it changes the evidentiary standard and it wouldn't convert it into non-harmless error. Have I answered your question? You're looking at me like I may not have. I'm thinking. On top of all that, you had Donald Trump's own testimony. Now, Mr. Trump is here today. He was given every opportunity by Judge Kaplan to show up at this trial, and he was even given until 5 o'clock p.m. on the Sunday before closings, and he didn't show. He had every opportunity to just take the stand and rebut all this evidence. He did not. He did not put on a single witness in the civil case. We put on 11. But what we did put in is this videotape of Access Hollywood where he basically says, I grab women by the pussy, excuse my language, without their consent, and then at his deposition that I took and asked him about that video, what did he say? He embraced it, Your Honor. Thank you for your time. We appreciate it. Mr. Sauer, you have two minutes. Thank you, Your Honor. Just to turn to that harmless error point, the standard for harmless error is the court has to have a fair assurance or a conviction that it did not influence the jury, and that argument really can't be made with a straight face here. I would point the court to you. Why is that? I noted a conspicuous absence of reference in your briefs to the so-called outcry witnesses, to Ms. Birnbeck and the other woman who had been spoken to at the, roughly contemporaneously. So why isn't that enough, that confirmatory evidence that's contemporaneous with the event? I'd say two things that sort of make that not a strong argument for them. One is the outcry witnesses had egregious bias against the defendant, their prior social media posts and text messages, said things totally unrelated to this case based on his politics, said that he's herpes we can't get rid of. But you had an opportunity to cross-examine them in front of the jury, right? Yes, but the question in harmless error is not could the jury believe it, but was the jury's judgment about that tainted by the fact that they'd also heard all this inflammatory evidence? And one thing that this court and other courts emphasize is how did the plaintiffs use it in their opening statement and their summation? And here they relentlessly hammered the propensity evidence, the access Hollywood tape, the Leeds testimony, the Stornow testimony. If you look at the summation, it's... I looked at the opening sentence, at the opening statement and the summation, and I didn't see the relentless hammering that you're describing. I saw mention of it, but also emphasis on the outcry witnesses. There is discussion of the outcry witnesses, but, for example, look at the summation. The first four pages of the summation go through access Hollywood, Leeds, and Stornow before they ever even get to Carroll's own story. And then if you go to the end, they emphasize it again, and it's emphasized again and again. How do you respond to the argument that the access Hollywood evidence is different from the propensity evidence? It's not propensity evidence. It's really a confession. They've argued it's propensity evidence in their brief. They say it's propensity, and it's hard for me to... What about the argument, whether it's new or not, that it's not propensity evidence, but it's a confession? How do you respond to that? It's hard to see how it's a confession because that's the underlying problem with it. They don't point to any specific incident that it's a confession of. And so for them to speculate... Well, it's a confession about a modus operandi. But modus operandi itself is inadmissible. And a confession to a modus operandi to be admitted and not be sort of so prejudicial and inflammatory, which is what it was and how it was used, is just not something that is admissible. It involves speculation and conjecture to assume that it relates to any specific incident when they've never identified one. I see my time has expired. Thank you so much. We appreciate it.